CHARLES C. MŒLLER *et al.*

*v.*

ALEXANDER McLAGAN.

SALE *of grain to be delivered at a future time—of keeping the margin good.* A party residing at a distance from the city of Chicago, employed a commission merchant in that city to purchase for him a quantity of wheat, to be delivered at a subsequent day. He agreed to allow the commission merchant one-half of a cent per bushel as compensation for purchasing, and to advance ten cents per bushel as a margin, and to keep it good at that sum. It was also understood that when the grain should be delivered, the commission merchant was to pay for and store the same, holding it to secure his advances, which, with interest and storage, were to be paid when the wheat should be sold. The wheat was purchased, and the margin, as agreed upon, was paid to the commission merchant, and soon after, the price of wheat began to decline, of which the commission merchant advised the party for whom he had purchased, and asked for instructions in regard to the sale of the wheat. Subsequently, the latter was advised that the margin already deposited had been absorbed by the further decline in the market, and was requested to put up more margin, which he failed to do, and thereupon the commission merchant sold the wheat at a considerable loss: *Held,* the margin not being kept good, the commission merchant had the right to sell the grain upon the notice given.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding.

Messrs. NISSEN & BARNUM, for the appellants.

Mr. JOHN J. McKINNON, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

In June, 1870, appellee employed appellants, as commission merchants, to purchase for him ten thousand bushels of wheat, to be delivered to him at his option at any time during the following month of July. He agreed to allow appellants one-half of a cent per bushel as compensation for purchasing, and to advance ten cents per bushel as a margin and to keep it good at that sum. It was also understood that, when the grain should be delivered, appellants were to pay for and store

the same, holding it to secure their advances, which, with interest and storage, were to be repaid when the wheat should be sold. The wheat was purchased, and appellee paid to appellants, as a margin, $1037.15. At the time of the purchase, appellee was living on the Dixon Air Line Railroad, some fifty-five miles from Chicago, and between Chicago and Cortland, his place of residence, with which there was telegraphic communication.

On the 24th of the same month appellants wrote to appellee, notifying him of a heavy decline that day, and that the market was sensitive. They also ask appellee to give positive instructions in regard to the sale of the wheat, and to state whether he wanted them to sell if the margin became absorbed, or to hold it at his risk. To this letter appellants received no reply. On the 27th they again wrote appellee, informing him of another heavy decline, and that "the bottom seemed to have dropped out of wheat." They also asked him to inform them by return mail whether he wished them to sell the wheat should prices decline to $1.05½, or whether he would send them more margin. On the next morning appellants sent him two telegrams. The first said, "Answer our yesterday's letter by telegraph on receipt of this." The second said, "Answer my dispatch of this morning immediately." Appellee answered, "Please hold that wheat until you get my letter." On the 28th, wheat declined to $1.03½, which more than exhausted appellee's margin, but they did not sell, as they say, hoping the letter would bring the necessary margin.

On the 28th, appellants again wrote: "Your margin was absorbed when prices touched $1.05 to-day. We received your dispatch before the decline to $1.03½, and did not sell your wheat, awaiting your letter of to-day. Our market is badly demoralized, and there is no telling how low prices may go. The bears are using their influence to break down prices, in view of the anticipated large delivery on the first of July, and we shall have to take in your wheat, pay for it and carry it. Awaiting your letter, we remain, etc."

Appellee also, on the 28th of June, wrote appellants as follows: "I do not want that wheat sold yet; I can put up more margin the last of the week; I think wheat will react the first of the month; it is a heavy loss for me at this present time; could it not be sold for the last half of July, so as to save something if we should conclude to sell? If you can get along without telegraphing so much I will be much obliged; it is quite expensive; no rain here yet—crop all gone up, except corn."

On the 29th, appellants wrote as follows: "Your favor of yesterday was duly received and contents noted. We are very sorry that the market has gone against you; nobody expected to see such a decline in so short a time; prices declined this A. M. to $1.00, but reacted and advanced to $1.07, closing this P. M. at four o'clock between $1.04 and $1.05. The sellers of your wheat informed us to-day that they will deliver the wheat on the first day of July; please send us an additional margin of $1000, and we will carry the wheat for you as long as it remains in good condition in our elevator. Should wheat get out of condition, we shall be compelled to sell out to the best advantage. There have been rumors of bad condition for the last six weeks, but they have never been substantiated, and are considered to be gotten up by the 'bear clique' to further their interest. Awaiting your immediate reply, we remain," etc.

Appellee says he received this letter on the 30th, and immediately answered as follows: "Your favor of the 29th is received. I hope you will not give yourself any uneasiness in regard to more margin; it is quite hard to collect money just at present; I may have to send you some good securities. How long do you think it will be before it will be known whether wheat is hot or not? What will it cost per bushel to carry it fifteen or thirty days? Perhaps it may be so that it can be sold for the last half of July and save something."

On the same day appellants also wrote as follows: "With reference to our letter of yesterday, we inform you that we

have sold out your wheat, to-wit: 5000 s. July at 1.04, and 5000, same option, at 1.04½. The condition of the wheat in our elevators is rather doubtful, and we did not feel like paying out good money for doubtful property. One cargo was being loaded at the Central Elevator to-day, and a large portion of the wheat was out of condition. We will not render account sales for this transaction, as we are prepared to assist you in making up your loss without charging another commission. We have refused to carry regular receipts of wheat for several of our customers for less than fifty cents per bushel margin on account of the uncertainty of the condition, and most of them have changed their deals to seller last half of July, paying the enormous difference of eight and nine cents per bushel. Let us know what we can do for you."

Appellee swears that he, at this time, had both the money and security to put up the additional margin, but he does not say that he offered to put it up otherwise than as proposed in his letters. Appellants swear that they purchased on the terms that appellee was to keep his margin good, and they were to carry it after it should be delivered, and charge appellee the usual rates of storage and interest. It was proved that the usage and custom of commission men in the city is, to require ten cents per bushel on grain as a margin, and that in cash. Such is shown to be the rule of the board of trade, and with business men. It appears that appellants would have been required to pay $11,700 had the wheat been delivered on the first day of July. This would have exceeded the margin some $87 as we understand it.

Appellants notified appellee that his margin was absorbed, and on the 27th he was asked whether appellants should sell if prices declined so as to exhaust his margin, or whether he would put up more margin. Here the alternative was presented, either to sell, or put up additional margin if the former deposit should be absorbed. They, on the 28th, notify him that the decline had more than absorbed his margin, and they notified him the seller had chosen to deliver on the first

of July; that wheat was heating in some of the elevators; and still he does not send a deposit to make his margin good, or give any orders to sell. He, it is true, says he does not want the wheat sold, but takes no steps to prevent it. He recognized the right of appellants to call for an additional deposit by saying he could send it the last of the week, and as a reason for not sending it at once, says that it was difficult to make collections.

From all the evidence in the case, we have no hesitancy in saying that appellants had the right to sell if the deposit was not kept good upon the notice they gave.

It might be urged that their statement in the letter of the 28th, that there would be a large delivery on the first of July, and they would have to take in appellee's wheat, pay for it and carry it, implies appellants were under obligation to do so, and appellee may have relied upon that statement. This, we do not think, is a fair construction of the language. They were urging him to deposit more money, according to the agreement, or direct them to sell. As we understand the usage in such cases, if he had kept his margin good they would have been required, on the delivery of the grain, to pay for it and store it as long as the margin should be kept good, and he paid interest and commissions. But they were not bound to do so except upon these conditions. This language, then, had reference to his keeping a sufficient deposit in their hands, and was used to remind him of the necessity of putting up the margin if he desired to carry the wheat. The evidence fails to sustain the verdict, and the court below should have granted a new trial.

The judgment of the court below is reversed and the cause remanded.

*Judgment reversed.*